# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SEAN PARKINSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>BMW OF NORTH AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sean Parkinson ("Plaintiff"), by and through his undersigned counsel, file this Class Action Complaint ("Complaint") against Defendant BMW of North America, LLC ("BMW" or "Defendant") individually and on behalf of all others similarly situated, and in support thereof, alleges as follows:

## NATURE OF THE CASE

1.    This is a consumer protection class action against BMW on behalf of a nationwide class of all persons who are current or former owners and/or lessees of the following automobiles: BMW 2 Series model years 2014-2021, BMW 3 Series model years 2014-2021, BMW 5 Series model years 20014-2021, BMW 6 Series model years 2014-2021, BMW 7 Series model 2014-2021, BMW X3 model years 2014-2021, BMW X4 model years 2014-2012, BMW X5 model years 2014-2021,

and BMW X6 model years 2014-2021 (the "Vehicles" or "Class Vehicles").[1]

2.    This action is brought to remedy violations of law in connection with BMW's manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles. The Class Vehicles' heating, ventilation, and air conditioning systems ("HVAC Systems") are plagued with a defect that causes the systems to: (a) accumulate mold and mildew residue or growth within the HVAC System; (b) emit a moldy, mildewy, or vinegar odor that permeates the vehicle cabin when the HVAC System is activated; and (c) cause the Vehicle's passenger cabin to be unbearable and thus unusable for its intended purpose. Tolerable and safe cabin conditions— including acceptable air circulation systems and passengers' ability to breathe clean and safe air emitted from Vehicle HVAC systems—are a requirement of baseline vehicle functionality and usability, and a minimum level of Vehicle quality.

3.    The HVAC Systems across the impacted Vehicle models and model years are substantially the same from a mechanical engineering standpoint in that the HVAC System in each Class Vehicle is made up of substantially the same components (e.g., evaporator, evaporator housing, ducting, fan, filter, drain lines, etc.) and employs the same general mechanism to deliver ventilation, heating, and

---

[1] The vehicles comprising the Class Vehicles in this lawsuit are subject to modification as Plaintiff develops his claims in this litigation during discovery. Plaintiff reserves the right to modify the list of vehicles comprising the Class Vehicles.

cooling to the passenger cabin.

4. During normal and expected conditions, the HVAC System fails to properly evaporate or drain the condensation that accumulates within the system, creating a moist, hospitable environment for the growth of bacteria, fungus, mold, and spores, which then are blown into the passenger cabin when the HVAC System is in use (the "Defect"). The mold-carrying air has a foul, moldy, mildewy, or vinegar smell that is highly unpleasant and, worse, that can cause respiratory problems and aggravate allergies.

5. The moldy and mildewy air emitted as a result of the Defect is not a one-time event in the Class Vehicles—Class Members (defined below) report that this occurs regularly, with some indicating that it occurs each time the HVAC System is turned on, and is especially pervasive in humid weather or after it has rained.

6. When Plaintiff and Class Members complain to BMW about the Defect, BMW offers only temporary "fixes," such as replacing the cabin air filter, inspecting drains for clogging, and applying various cleaners—none of which remedy the Defect. Therefore, these purported "fixes" are not truly fixes at all. Worse still, BMW makes Class Members pay out of pocket for these nonpermanent "fixes" for the Defect even if Class Members' vehicle are still under warranty.

7. Properly functioning HVAC Systems in automobiles that circulate

clean and safe air into vehicle cabins are a baseline requirement vehicle functionality, reliability, and safety, and is necessary for a minimum level of quality. But the Defect inhibits Class Members' expected, comfortable, and safe use of the HVAC Systems in their Vehicles, and requires Class Members to seek out and pay for repeated temporary repairs.

8.    Prior to selling and leasing the Class Vehicles, BMW knew of the Defect through rigorous pre-release and field testing, technical service bulletins ("TSBs"), service center data, replacement part sales data, early consumer complaints made directly to BMW, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), and/or posted on public online vehicle owner forums, aggregate data from BMW dealers, and other internal sources unavailable to Plaintiff without discovery.

9.    Despite this knowledge, BMW failed to disclose and actively concealed the Defect from Plaintiff, Class Members, and the public.

10.    In fact, BMW represents that:

The air quality in the vehicle is improved by the following components:

- Emission tested passenger compartment.
- Microfilter.
- Air conditioning system to control the temperature, air flow and recirculated-air mode.

Depending on the equipment specification:

- Microfilter/activated-charcoal filter.
- Automatic recirculated-air control AUC.

- 4 -

- Parked-car ventilation.

11.     BMW also advertises that its Vehicles' automatic recirculated-air control system "activates whenever certain pollutants are detected" to maintain interior air quality.

12.     BMW knew or should have known that its attempted repairs, which are costly and for which it routinely charges Class Members, were not permanent solutions for the Defect.

13.     As a result of BMW's alleged misconduct—including its fraudulent omissions and misrepresentations, deceptive, fraudulent, and unfair practices in violation of consumer protection statutes, and breaches of express and implied warranties—Plaintiff and Class Members were harmed and suffered actual damages. Specifically, the Class Vehicles have manifested, and continue to manifest, the Defect, and BMW has not provided a permanent remedy for this Defect. As such, Plaintiff and Class Members are forced to continue to drive with unhealthy cabin and air quality conditions while riding in Class Vehicles. Furthermore, Plaintiff and Class Members incurred, and will continue to incur, out-of-pocket and unreimbursed costs and expenses relating to the Defect.

14.     BMW has failed to provide a permanent fix for the Defect and failed to reimburse Class Members for the costs of its inadequate and temporary attempted repairs. BMW has not recalled the Class Vehicles, has not successfully remedied the

Defect, has not made owners of the Vehicles whole, and has not made the Class Vehicles safe.

15.     As a result of BMW's misconduct, Plaintiff and the other Class Members were each injured on account of receiving Vehicles that were fundamentally different from what they believed they were purchasing, and less valuable than was represented.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this matter is brought as a class action pursuant to Fed. R. Civ. P. 23, the proposed Class includes more than 100 members, the Class contains at least one member of diverse citizenship from Defendant, and the aggregate amount in controversy exceeds five million dollars ($5,000,000) excluding interest and costs.

The Court has personal jurisdiction over Defendant because Defendant maintains a principal place of business in this District, and Defendant has made sufficient contacts in this District, including the marketing, distribution, sale, and/or lease of the Vehicles.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is deemed to reside in this District, and a substantial part of the events, acts, and omissions giving rise to these claims occurred in this District.

## PARTIES

### Plaintiff Sean Parkinson

18.    Plaintiff Sean Parkinson is an adult citizen and resident of Pembroke Pines, Florida. In or about June 2021, Plaintiff purchased a certified pre-owned 2018 BMW 540i from Lauderdale BMW of Pembroke Pines. At the time of his purchase, Plaintiff's vehicle (the "Vehicle") displayed approximately 36,000 miles on the odometer.

19.    BMW's website and warranty manual for the Class Vehicle make no mention of the Defect. At the time of purchasing his Vehicle, Plaintiff was not informed by BMW of the Defect. The Defect was not disclosed by BMW's authorized dealership, on the Vehicle's window sticker, or elsewhere at the time Plaintiff purchased the Vehicle.

20.    In mid-June 2021, the Defect manifested, causing a strong vinegar smell to emanate from the HVAC System of Plaintiff's Vehicle upon startup as soon as the air-conditioning began to blow air into the cabin. This issue has continued until the present day.

21.    In early November 2021, Plaintiff brought his Vehicle to  Lauderdale BMW of Pembroke Pines and informed the service department of the Defect which offered no remedy.

22.     On November 19, 2021, Plaintiff again contacted the Lauderdale BMW of Pembroke Pines service department out of concern that the mildew/mold present in his HVAC System could have negative health effects for him and his family as the Defect continued to manifest. A dealership representative in the service department informed him that the Defect was known to BMW, that there was no remedy BMW could offer to eliminate the Defect. The dealership representative informed Plaintiff that he, too, experienced the Defect in his own BMW Vehicle.

23.     Plaintiff continues to experience the Defect, which causes a vinegar smell and respiratory health concerns during cabin occupation due to the moldy, mildewy, and otherwise unsafe air emitted from the Vehicle's HVAC System.

24.     Had BMW disclosed the Defect on its website, in its warranty manuals for Class Vehicles, on the Vehicle's window sticker, or communicated the Defect to its authorized dealership, prior to Plaintiff purchasing the Vehicle, Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it. As a result, Plaintiff received less than what he paid for the Vehicle and did not receive the benefit of his bargain.

**Defendant BMW of North America, LLC**

25.     Defendant BMW of North America, LLC is a Delaware corporation with a principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. Defendant has sold and leased, and continues to sell and lease, the

Vehicles to consumers throughout the United States. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers, distributors, and other agents, the Vehicles in the United States to Plaintiff and the other Class Members.

## FACTUAL ALLEGATIONS

### A.   Overview of Automobile HVAC Systems and HVAC Mold/Mildew

26.    Due to the Defect, the HVAC Systems in the Class Vehicles are predisposed to producing a moldy odor under normal use conditions that would not cause non-defective HVAC systems to produce a moldy odor, compromising the comfort, enjoyment, and respiratory health of Vehicle occupants and requiring them to pay for costly repeated nonpermanent "solutions" that do not prevent the recurrence of the problem or eliminate the Defect.

27.    The basic purpose of an HVAC system in vehicle air conditioning is not only to heat or remove unwanted heat from the passenger cabin, but also to purify and circulate clean and safe air throughout the vehicle.

28.    Automobile HVAC systems can be controlled either automatically or manually by the driver or passengers, and, in some vehicles, conditioned air distribution can be "zone" controlled.

29.    Contrary to popular belief, vehicle air conditioning and HVAC systems do not create cool air, but instead cool the air by removing hot air and moisture.

30.     An HVAC system is made up of the following components: compressor, condenser, evaporator, expansion valve, and an accumulator (or receiver-drier). Each of these components serves a different purpose.

31.     A vehicle's compressor is powered by a serpentine belt, and compresses refrigerant into a liquid, putting it into a high-pressure state. This pressure forces the liquid out of the compressor through the hoses in the air conditioner hose assembly, which carry refrigerant through the HVAC system. Compressed refrigerant travels from the compressor to the condenser on the high-pressure side of the system to cool off before reaching the air conditioning evaporator core on the low-pressure side.

32.     The condenser, which is like a small radiator, is where the air conditioning hoses come into contact with outside air, which absorbs heat from the liquid inside before the liquid reaches the air conditioner in-line filter, which removes debris that could contaminate the system. The now-cooled refrigerant moves to the low-pressure side of the system through either expansion valve. There it goes through the evaporator core in a gaseous state, allowing the refrigerant to absorb heat from the air that passes through the evaporator fins. This leaves the cabin filled with cool air while the warm refrigerant makes its way back to the compressor.

33.     The diagram below illustrates the components and functioning of an

automobile HVAC system[2]:



Air conditioning system diagram

34.     As a vehicle's HVAC system cools air, condensation forms on the system's evaporator. In a functional HVAC system that is not defective, this condensation is evaporated through the activation of a fan and airflow over the evaporator.

35.     Unfortunately for purchasers and lessees of the Class Vehicles, condensation that forms on the evaporator and elsewhere within the Vehicles' HVAC Systems does not properly and fully evaporate due to the Defect. The residual

---

[2] MECHANICAL BOOSTER, *How a Car Air Conditioning System Works? – Nicely Explained,* https://www.mechanicalbooster.com/2017/12/car-air-conditioning-system.html (last visited Dec. 10, 2021).

moisture provides a haven for the growth of mold and mildew, as harmful spores enter the system through outside vents.

36.     Certain of these molds can secrete mycotoxins, creating and contributing to the foul odors experienced by Plaintiff and Class Members. Mycotoxins are toxic to humans, and are known to cause some or all of the following: allergic reactions, infections, cellular damage, DNA damage, interference with RNA synthesis, inflammation, gastroenteritis, and other harmful effects.

37.     The Defect in the Vehicles' HVAC Systems causes the systems to retain moisture and promote the growth of mold that can result in or promote reactions, diseases, symptoms, or other respiratory and health complications in passengers of Class Vehicles, presenting a risk to their health and safety.

38.     Over time, the mold, mildew, and/or fungus growing in the evaporator can spread, resulting in reduced HVAC System efficiency, while also becoming more difficult to remove and requiring evaporator replacement in some instances.

39.     Moreover, the tightly sealed and enclosed passenger compartment causes concentration levels of toxic smells and chemicals to become much higher than in larger and less tightly sealed spaces.

40.     Replacing the filter is not a permanent fix for the Defect because the filter is "upstream" from the evaporator.

41.     Inspecting drains and the use of various cleaning products also are not

permanent fixes for the Defect because this does not address the Defect that allows the growth of odor-causing mold or mildew in the first place.

## B. BMW Had Knowledge of the Defect in the HVAC Systems.

### 1. BMW Had Pre-Sale Knowledge of the Defect From Pre-Sale Vehicle and HVAC System Testing

42. Prior to the sale or lease of the Class Vehicles, BMW knew of the Defect through, or as evidenced by, pre-release testing information, TSBs, service center data, replacement part sales data, early consumer complaints made directly to BMW, collected by NHTSA ODI, and/or posted on public online vehicle owner forums, testing done, including testing in response to consumer complaints, aggregate data from authorized BMW dealerships, and other internal sources unavailable to Plaintiff without discovery.

43. At the same time BMW was selling and leasing the Class Vehicles to Plaintiff and the car-buying public, BMW was well aware of the problems with Class Vehicles' HVAC Systems, both from the internal validation and testing that BMW performed and from its past experience and expertise with automobile HVAC systems.

44. As discussed *supra,* HVAC systems in automobiles are complicated systems involving numerous components that require special attention to guarantee function over a long period of time—this is readily obvious to qualified engineers, and is well known to BMW.

45.     BMW requires that each Vehicle component is tested for durability and functionality before production. BMW employs teams of engineers or specialists whose work is focused on testing the functionality of the HVAC Systems in the Vehicles, and these individuals are responsible for guaranteeing full vehicle and component performance for durability requirements.

46.     As part of the vehicle production preparation phase, automakers seek to assure long-term reliability through aggressive durability and performance testing, and vehicles are subjected to rigorous regimens of testing before beginning mass production in order to ensure no quality issues.

47.     On information and belief, prior to sale, BMW tests the HVAC Systems by running the engines in the Vehicles for extended periods of times over thousands of cycles with heating and air conditioning running at varying levels and temperatures. BMW performs this type of testing to observe the long-term effects of use of the HVAC tests and to determine and understand how long-term use will impact the performance of the HVAC Systems. This testing, and other similar testing, is intended to ensure the HVAC Systems and their component parts will last their full life-cycle and function properly during that period.

48.     Also as part of pre-sale testing, and on information and belief, the HVAC Systems and their component parts are inspected prior to assembly and are disassembled to verify that there are no quality concerns, and this process can entail

a series of hundreds or thousands of checks.

49. Because simply running the HVAC Systems in the Vehicles is what prompts the Defect to manifest, BMW's routine testing of those systems in the production phase and prior to sale necessarily uncovered the Defect and revealed it to BMW. During the course of this and other quality validation testing conducted by BMW's engineers prior to their sale, BMW became aware of the defective HVAC Systems.

50. Furthermore, on information and belief, as part of its pre-sale testing, BMW performs testing on the air quality within Vehicle cabins while the Vehicles' HVAC systems are running. This testing is performed over extended periods of time to ensure that the HVAC System is performing as intended, including removal of particulates, debris, and other impurities from the air being circulated into the cabin, and to ensure that the cabin air quality is safe for breathing. On information and belief, such testing would have necessarily revealed to BMW that the air being blown into the Class Vehicle cabins during routine operation of the HVAC Systems has mildewy, moldy, or vinegary smell, and poses a risk to human health.

51. Because the Defect manifests so suddenly after consumers purchase or lease Vehicles, it also can be reasonably inferred that the BMW's pre-sale testing would have revealed the Defect.

### 2. BMW's TSBs and Dealership Repairs Evince Knowledge of the Defect

52. BMW's knowledge of the Defect is also evident in the TSBs issued by it concerning moldy smells emanating from the HVAC Systems in the Class Vehicles.

53. In October 2004, BMW issued a TSB—No. SI 64 04 03—regarding "Air Conditioning System Musty Odor" informing its service centers that "customer may complain of a musty odor that is coming from the heating and air conditioning system." This condition was attributed to "certain environmental conditions." Under the Model section of the TSB, Defendant indicated that "ALL" models are vulnerable to this condition. The TSB instructs service center to use an aircomatic ultrasonic cleaner and related tool which allowed treatment of the mold condition without "drilling or disassembly of the vehicle."

54. In February 2018, Defendant reissued and updated the October 2004 TSB to describe that vehicles equipped with "IHKR (Integrated heating and air conditioning) or IHKA (automatic heater and A/C-control)" systems to be vulnerable to the mold condition. Again, the TSB lists that "ALL" models are susceptible to this condition. It is evident from the models specifically identified in the later "Procedure" section that every model of BMW automobile produced by Defendant since its issuance of the October 2004 TSB is susceptible to this condition.

55.     In June 2018, and again in July 2018, Defendant reissued and updated the February 2018 TSB to include even more models of its vehicles.

56.     In each of the February, June, and July 2018 TSBs under the Warranty Information section the Defendant asserted that "The condition described in this bulletin is influenced by environmental and other external factors (dust, pollen, smoking, pets, etc.), therefore, *corresponding repairs are not covered under the BMW limited warranties*." (emphasis added).

57.     BMW also knew or should have known about the Defect because of the large number of HVAC System services, repairs, cleaning treatments, and component replacements made to those systems, both during and beyond the warranty period.

58.     BMW collects, reviews, and analyzes detailed information about repairs made on vehicles still under warranty at its dealerships and service centers, including the type and frequency of such repairs. Complete data on such repairs is exclusively within BMW's control and unavailable to Plaintiff without discovery.

59.     BMW also knew or should have known about the Defect because of the large number of replacement cabin air filters ordered from BMW as part of attempts to remedy the Defect, which further alerted BMW of the Defect and that it affects a wide range of its Vehicles.

60.     Upon information and belief, BMW-authorized service centers use

replacement parts that they order directly from BMW. Therefore BMW would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement cabin air filters. The ongoing high sales of replacement cabin air filters and cleaning supplies (e.g., Wynn's Aircomatic Ultrasonic Cleaner) was or should have been known to BMW, and alerted BMW that its HVAC Systems were defective and causing Class Vehicles' HVAC Systems to emit moldy and mildewy odors frequently and consistently.

### 3. Consumer Complaints Provided BMW with Knowledge of the Defect

61.     BMW also knew or should have known about the Defect because numerous consumer complaints regarding failures of the HVAC System were made directly to BMW. The large number of complaints, and the consistency of their descriptions of the Defect and the related mold formation and foul, noxious odors that the Defect caused in the Class Vehicles, alerted or should have alerted BMW to this serious defect affecting a wide range of its vehicles.

62.     The full universe of complaints made directly to BMW about the Defect is information presently in the exclusive custody and control of BMW and is not yet available to Plaintiff prior to discovery. However, upon information and belief, many Class Vehicle owners complained directly to BMW and BMW dealerships about the repeated HVAC System failures their vehicles experienced.

63.     For example, some instances of these direct-to-BMW complaints are

described in Class Vehicle owners'/lessees' complaints logged with NHTSA's Office of Defect Investigations ("NHTSA ODI") and posted on online vehicle owner forums:



[3] BIMMER FEST, https://www.bimmerfest.com/threads/bad-sour-smell-coming-from-the-a-c-after-tuning-on.1084289/ (last visited Dec. 10, 2021).
[4] BIMMERPOST, https://f30.bimmerpost.com/forums/showthread.php?t=1323608 (last visited Dec. 10, 2021).



**bcornwellatl**

Second Lieutenant

24
REP

297
POSTS

Drives: 2013 F30 328i
Join Date: Dec 2012
Location: Suwanee, GA

iTrader: (**0**)

So this is cool that others have the same problem, because my car also has the funk... and I took it back to the dealer and was told it's mold growing on the AC coils... which of course, BMW doesn't warrant. They could charge me to take everything apart, spray it down with anti-mold crap (probably Lysol) and put it back together ($428), but the advisor said they have done that for a few people, just to have the car return. So here is what the lead mechanic had to say... "with the recirculate air turned on, when you park the car after a hot day, the water drips onto the coils. The heat causes the water to turn into mold, and when you turn the car on, it has that odor at the beginning and then goes away after about 30 seconds. To help stop this, either don't use recirculate, or before you get home, turn off recirculate so that the fresh air can dry the coils before you park the car in the garage". My answer was "I've owned a many of Ford cars over the years... and I've never had this happen... and those cars were half the cost of this one... " he laughed and said yep, he drives a Nissan and it doesn't have the problem... but he did tell me to use the Lysol trick... but now he said to also turn on the recirculate and spray the Lysol inside the car... under the passenger foot well, being mindful not to point the vents to your face. Spray and then leave the car running for about 10 minutes with the doors closed. Then carefully open the doors (being careful not to breath) and turn the car off and leave the doors and windows open for about 30 min. He also said to spray for the outside like above. He said this will have to be done once every 2 months or so when it's hot. Kind of sucks that we have to do this, and I'm looking for one of those foggers that I can just open up in the car and not have to spray Lysol, but can't find one that targets mold...

Appreciate 1

QUOTE

5

[5] BIMMERPOST, https://f30.bimmerpost.com/forums/showthread.php?t=1153636 (last visited Dec. 10, 2021).



05-20-2016, 01:05 AM #8

**Taunto**
Car Enthusiast

266
REP
500
POSTS

Drives: 2016 BMW M235 X-drive
Join Date: Apr 2011
Location: Regina

iTrader: (0)

hey everyone.
We see this issue from time to time here at the dealership.
Mainly from vehicles that have been sitting on the lot for a while and have had some damp weather followed by some hot/humid weather.

I will half to find the exact name and possibly part number of the product we use at the dealer to help fix this concern(just cant remember the name of the product for the life of me right now)

Basically it has a high pressure Aerosol Can cleaner where the tab locks. You Place the can on the passenger foot well where the blower intake is. Have the vehicle running, blowing through main vents and MANUAL RECIRC ON with the A/C system running.
Once then u open the passenger door, Place the can on the floor then Hit the button so that it locks into place... And close the door right away and let ur vehicle run for 15-20 mins or so.

U do not want to breath this chemical stuff in as it isnt the best thing for your lungs lol.
Once the time has passed and the Can is empty, What i like to do is roll all the windows/sunroof down and take the car for a quick rip onto the highway just for 5 mins or so, to help blow some of the chemical smell out, just so its not super strong.

What this product does is help burn/kill any kind of mold or stuff clinging to the evaporator. Works great for pretty much all our customers with this exact complaint.

Like i said I will try to post the Product with a picture and and part number tomorrow once at work. Just cant think of the name of it right now. Sorry

Appreciate   2     Neophyte     QUOTE

64.     As the above sampling of complaints shows, Class Vehicle owners have been vocal in complaining directly to BMW about the Defect, and the number and consistency of their complaints should have alerted BMW to the existence of the Defect.

---

[6] BIMMERPOST, https://www.2addicts.com/forums/showthread.php?t=1263579 (lasted visited Dec. 10, 2021)

### 4. BMW Knew of the HVAC Defect from Class Member Complaints Collected by NHTSA's ODI

65.     In addition to complaints made directly to BMW, many Class Vehicle owners lodged complaints about the HVAC Defect with NHTSA's Office of Defect Investigations ("NHTSA ODI"), beginning as early as 2004, and likely earlier.

66.     Federal law requires automakers like BMW to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

67.     Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers ongoing obligation to identify potential defects in their vehicles, such as failures of HVAC Systems to filter air and emit air free of mold and odors as intended.

68.     From its monitoring of the NHTSA databases, BMW knew or should have known of the many complaints about HVAC System failure logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, BMW to the Defect. A sampling of the publicly available complaints lodged with NHTSA ODI include the following:



**2011**
**BMW 328I**
C RWD

**8**
RECALLS

INVESTIGATIONS 1
COMPLAINTS 387

Not been rated
OVERALL SAFETY RATING

November 17, 2020 NHTSA ID NUMBER: 11375136
**Components: UNKNOWN OR OTHER**

**NHTSA ID Number:** 11375136

**Incident Date** November 20, 2016

**Consumer Location** NORWOOD, MA

**Vehicle Identification Number** WBAPK5C57BA****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | THERE IS AN ISSUE WITH THE HVAC SYSTEM ON MY CAR EVERY ONE I KNOW WHO OWNS THE BMW E90 SERIES HAS THE SAME ISSUE THE EVAPORATOR LEAKS TOXIC GAS EVERY BMW OF THIS ERA HAS THE SAME ISSUE WHEN YOU TURN THE AC THERE IS A MOLDY GASY SMELL PEOPLE WHO OWN THESE CARS BREATH TOXIC CHEMICALS EVERY TIME THEY DRIVE THESE CARS TO FIX THE ISSUE YOU HAVE TO REMOVE THE WHOLE DASH TO GET TO THE LEAKY EVAPORATOR AND REPLACE IT WHICH COSTS $3000 THE PART ITSELF IS ONLY $300 AND THE REST IS LABOR , ANOTHER ISSUE IS WITH THE STEERING COLUMN SHAFT. MY CAR AS OF NOVEMBER 16 2020 HAS ONLY 51K MILES |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

1 Affected Product ▾

☐ **Request Research** (Services fees apply)



**2014**
**BMW X1**
**XDRIVE28I**
SUV AWD

**5**
RECALLS

INVESTIGATIONS 2
COMPLAINTS 70

Not been rated
OVERALL SAFETY RATING

November 19, 2020 NHTSA ID NUMBER: 11375464
**Components: UNKNOWN OR OTHER**

**NHTSA ID Number:** 11375464

**Incident Date** November 19, 2020

**Consumer Location** PITTSBURGH, PA

**Vehicle Identification Number** WBAVL1C56EV****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TOXIC MOLD IN VENTILATION PLUMBING. MAKES ALL OF US SICK IF WE TURN ON AC, HEAT, OR DEFROST. AS A RESULT CAN'T SEE OUT OF WINDSHIELD WHEN IT GETS FOGGED UNLESS WE ALL WANT TO GET SICK. MECHANIC IS STATING THERE IS NO SOLUTION FOR THIS. HE HAS CONSULTED BMW DEALERSHIP MECHANICS AND THEY ARE STATING THE SAME INFORMATION. THE ONLY SOLUTION GIVEN WAS TO REMOVE THE ENTIRE DASH, ALL VENTILATION PLUMBING AND HAND CLEAN IT. HOWEVER, THE PROBLEM WILL COME BACK. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

1 Affected Product ▾

☐ **Request Research** (Services fees apply)

69.     As the above sampling of complaints makes clear, Class Vehicle owners and lessees have been vocal in complaining to NHTSA ODI about the Defect since at least 2016, and BMW was, or should have been, aware of and monitoring those complaints, and thus should have known about the Defect since at least 2016,

if not earlier as evidenced by the TSB issued in October 2004, and reissued to include all recent car models in February 2018.

**5. BMW Knew of the Defect Based on Class Member Complaints on Public Online Forums**

70.     Forums and message boards relating to BMW's Vehicles are also replete with complaints about the Defect, demonstrating that Plaintiff's experience is not an isolated event. A small sampling of the many complaints about musty and mildewy air being emitted from Class Vehicle HVACs are below:



---

[7] BIMMER FEST, https://www.bimmerfest.com/threads/bad-sour-smell-coming-from-the-a-c-after-tuning-on.1084289/ (last visited Dec. 10, 2021)



**Vinegar smell from HVAC** ⟨⟨

Mon Aug 03, 2020 1:58 pm

With everything going on my car has been sitting in an underground garage (73 ambient) and connected to a level 2 charger. I noticed a faint vinegar smell on "cold start" with no preconditioning the other day and was wondering what's going on. It only lasts a few seconds and then dissipates. When running outside in the 80s / 90s for a couple hours the A/C fan does kick on while charging in the garage.

Any ideas what's going on?

**ronin**

Posts: 18
Joined: Sat Oct 28, 2017 3:53 pm

---

8 BIMMERPOST, https://f30.bimmerpost.com/forums/showthread.php?t=1385740 (last visited Dec. 10, 2021)

9 MY BMW I3, https://www.mybmwi3.com/forum/viewtopic.php?t=17002 (last visited Dec. 10, 2021).

Posted by u/aredeex 1 year ago

⇧

10

⇩

## Vinegar smell from ac for a few seconds?

I have had the car for about 4 weeks now and never noticed this until the other day.

When I start the car and AC starts blowing, its smells like vinegar for a few seconds and then goes away.

Does anyone else have this problem or a solution?

Google puts me down the path of mold/mildew ac replacement etc etc.

This is a 2017 rex. Cali climate.

Thanks for any help!

💬 15 Comments    ↗ Share    🔖 Save    🚫 Hide    🚩 Report        100% Upvoted

10

---

[10] REDDIT,
https://www.reddit.com/r/BMWi3/comments/ifjwrs/vinegar_smell_from_ac_for_
a_few_seconds/ (last visited Dec. 10, 2021).



11

71.    As shown by this small sampling of complaints from websites such as www.reddit.com, www.bimmerforms.com, www.bimmerfest.com, www.bimmerpost.com, and www.mybmwi3.com consumers have been vocal in complaining about the Defect and the damage being caused by the Defect. BMW tracks and monitors such sites and was aware of the Defect in the Class Vehicles.

72.    In sum, as early as 2004, and likely earlier, BMW was aware of the

---

[11] BIMMERFORUMS,
https://www.bimmerforums.com/forum/showthread.php?2158950-Help-air-conditioner-smells-like-vinegar! (last visited Dec. 10, 2021).

Defect, should have been aware of the Defect through the exercise of reasonable care, and/or was negligent in failing to be aware of the Defect, based on, among others, the following sources:

a)   Knowledge gained through BMW's extensive pre-sale testing regimen;

b)   TSBs evincing knowledge of moldy smells in/from HVAC Systems issued by BMW to its dealerships and service centers;

c)   Detailed data gathered by BMW about large number of Defect servicings;

d)   Knowledge BMW had of the large number of replacement HVAC System component parts and cleaners ordered from BMW;

e)   Numerous and consistent vehicle owner complaints made directly to BMW about the Defect;

f)   Numerous and consistent vehicle owner complaints collected by NHTSA ODI about the Defect;

g)   Numerous and consistent vehicle owner complaints made on online vehicle owner forums; and

h)   BMW service center employees' familiarity with and knowledge of the Defect.

73.     Moreover, the large number and consistency of Class Member complaints describing the Defect's propensity to cause a moldy odor to emit from the air-conditioning underscores the fact that Class Members considered the Defect to be a material issue to the reasonable consumer.

## C.     **Applicable Warranties**

74.     BMW sold Class Vehicles with a near identical "New Vehicle Limited Warranty" which included, among other warranties, protections against defects:

> BMW of North America, LLC (BMW NA) warrants  during the Warranty Period the 2021 U.S.-specification BMW vehicles distributed by  BMW NA or sold through the BMW NA European  Delivery Program against defects in materials or  workmanship to the first retail purchaser, and  each subsequent purchaser.

> \* \* \*

> The authorized BMW center will, without charge for  parts or labor (including diagnosis), either repair or replace the defective  part(s) using new or authorized remanufactured parts.[12]

75.     BMW represents that "[e]very BMW Certified vehicle is backed by our BMW Certified Pre-Owned (CPO) Limited Warranty."[13] This provides comprehensive coverage for one year with unlimited miles, after the expiration of the 4 year/50,000-mile BMW New Vehicle/SAV Limited Warranty.

---

[12] This warranty language is provided for the 2021 product year, however, on information and belief, this warranty language is near identical for each of the Class Vehicle model years and models.

[13] BMW, *BMW Certified,* https://www.bmwusa.com/certified-preowned.html (lasted visited Dec. 10, 2021).

76. Both BMW's New Vehicle Limited Warranty and its Certified Pre-Owned Limited Warranty extend coverage to the climate control system, which includes the HVAC System.

77. Based on Plaintiff's experiences and reports from other consumers, BMW refuses to cover the nonpermanent "fixes" under warranty, and instead requires Class Members pay out of pocket for these nonpermanent "fixes" for the Defect even if Class Members' vehicle remained under warranty at the time.

### D.  **BMW's Marketing and Concealment**

78. Upon information and belief, BMW knowingly manufactured and sold the Class Vehicles with the Defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' HVAC Systems.

79. BMW directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, mailings, and through other mass media.

80. BMW's marketing material describes the various Class Vehicles as "luxurious," "[e]quipped with advanced engineering and impressive design" and "impeccable luxury finishes." Drivers will be able to "[m]aster any road condition in an ergonomically optimized cockpit that immerses you in rich materials and finishes. Standard sport seats, automatic 3-zone climate control with separate temperature and air-distribution functions and rear seatbacks with adjustable

reclining set a standard of excellence for driving comfort and convenience." In fact, BMW's long-time slogan for its vehicles is "sheer driving pleasure."

81.     Although BMW knew of the HVAC Systems' propensity to pool water and foster the growth of mold and other odor-causing growths, it failed to notify Plaintiff and Class Members of this prior to their purchase of the vehicle.

82.     BMW's marketing materials highlighted features of the vehicles cabin. The following is a small sampling of such comments:

a)     "Step inside the X1 and experience an exceptionally comfortable interior."

b)     "Standard Sport Seats, three-zone climate control, and larger available screens come together in the cabin of the new X3."

c)     "Cruise comfortably on every trip. Style, space, and safety come together in the 2022 BMW X3."

d)     "The 2022 BMW X5 features ample cargo capacity and passenger seating, impeccable luxury finishes, and options for your comfort and convenience."

e)     "Space never had so much luxury. The Luxury Package ensures that your 3 Series Sports Wagon envelopes you in total comfort while driving."

f)     "The 2022 BMW 5 Series Sedan stands out with sophistication

throughout, including a fresh new design, luxurious interior, and convenient driving technology."

83.     BMW's marketing uniformly omits mention of the Defect or cabin air quality concerns, and Plaintiff and Class Members reasonably believed and expected that mold/mildew and foul smells would not emanate from Class Vehicles' HVAC Systems. Reasonable consumers do not expect that automobiles and HVAC systems in automobiles will harbor and facilitate the growth of organic materials regularly giving rise to foul odors.

84.     Further, BMW represents that "[b]efore a pre-owned BMW can receive the distinction of being Certified, it has to go through a detailed 360° vehicle inspection, get reconditioned and approved by our trained technicians who know it best—because who's doing the certifying matters," and they "inspect every vehicle for safety, performance, and wear, down to the subtle details. If it can't be fixed to our standards, it can't be a Certified Pre-Owned BMW." Then, after the Certified Pre-Owned BMW meets extensive body and mechanical requirements, "it goes through a comprehensive road test by BMW experts, using all-BMW diagnostic equipment, so it lives up to our reputation—and your expectations."

85.     In practice, the Class Vehicles are not as comfortable or enjoyable as BMW's marketing represents. BMW concealed the fact that its so-called "Luxury" Class Vehicles, which supposedly are "[e]quipped with advanced engineering and

impressive design" and "impeccable luxury finishes," are not comfortable or enjoyable under ordinary conditions because the HVAC Systems repeatedly and consistently emit foul moldy odors into the passenger cabin.

86. Plaintiff and Class Members were exposed to BMW's long-term, national, multimedia marketing campaign touting the supposed sophistication and comfort of the Class Vehicles, and Class Members justifiably made their decisions to purchase/lease their Class Vehicles based on BMW's misleading marketing and omissions, all of which concealed the true, defective nature of the Class Vehicles' HVAC Systems.

87. Further, BMW knowingly misled Class Members about and omitted the true, defective nature of the Class Vehicles. As detailed above, upon information and belief, BMW has been aware of the Defect since at least 2004, and likely earlier, through arbitration actions, TSBs, the high number of HVAC System servicings and replacement component part sales, and the numerous and consistent complaints about the Defect made directly to BMW, collected by NHTSA and posted in public online forums.

88. Despite BMW's knowledge of the Defect, BMW told Class Members who called its customer service about the Defect that BMW had never heard of the problem before and that no others had reported issues with their Class Vehicles' HVAC Systems, and made Class Members pay for temporary "band aid" repair

measures out-of-pocket.

89.     In sum, BMW has actively concealed the existence and nature of the Defect from Class Members since at least 2004 despite its knowledge of the existence and pervasiveness of the Defect, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles. Specifically, BMW has:

a)     Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Defect;

b)     Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' HVAC Systems were defective and not fit for their intended purposes;

c)     Failed to disclose, and actively concealed, the fact that the Class Vehicles' HVAC Systems were defective, despite the fact that BMW learned of the Defect as early as 2004, and likely even earlier;

d)     Failed to disclose, and actively concealed, the existence and pervasiveness of the Defect even when directly asked about it by Class Members during communications with BMW, BMW Customer Assistance, BMW dealerships, and BMW service centers;

e) Actively concealed the Defect by forcing Class Members to bear the cost of temporary measures to address the moldy smells;

f) Actively concealed the Defect by repeatedly treating the mold and odors with temporary measures, such as flushing the system, replacing filters, and using cleansers, while leaving the defective HVAC Systems as they were, so that the Defect has never been permanently corrected in Class Members' vehicles, even though Class Members were led to believe that the services had cured the moldy odor problem in their vehicles; and

g) Actively concealed the Defect by knowingly selling and installing replacement cabin air filters and using cleansers in Class Vehicles, while knowing and concealing that these temporary measures would not prevent the recurrence of mold formation and foul, noxious odors because the HVAC Systems remained defective.

90. By engaging in the conduct described above, BMW has concealed, and continues to conceal, the Defect from Class Members. If Class Members had knowledge of the information BMW concealed, they would not have bought or

leased the Class Vehicles, or would have paid less for them.

91.     Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at BMW responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. BMW necessarily is in possession of or has access to all of this information.

92.     Plaintiff's claims arise out of BMW's fraudulent concealment of the Defect and the foul moldy air it causes, and its representations about the luxury, advanced engineering, impressive design and comfort of the Class Vehicles' HVAC Systems. To the extent that Plaintiff's claims arise from BMW's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases his claims.

93.     Plaintiff alleges that, at all relevant times, including specifically at the time he purchased or leased his Class Vehicle, BMW knew, or was reckless in not knowing, of the Defect; BMW was under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it; and BMW never disclosed the Defect to the Plaintiff or the public at any time or place or in any manner.

94.     Plaintiff makes the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily

available only to BMW:

    a)    ***Who***: BMW actively concealed the Defect from Plaintiff and Class Members while simultaneously touting the safety, comfort, sophistication, and world-class quality of the Class Vehicles, and omitting the truth about the Defect, as alleged *supra*. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at BMW responsible for such decisions.

    b)    ***What***: BMW knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged, *supra*. BMW concealed the Defect and made contrary representations about the safety, comfort, sophistication, and world-class quality, and other attributes of the Class Vehicles, as specified, *supra*.

    c)    ***When***: BMW concealed material information regarding the Defect at all times and made representations about the world-class quality, sophistication, state-of-the-art safety and comfort of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an

ongoing basis, and continuing to this day, as alleged, *supra*.
BMW has not disclosed the truth about the Defect in the Class
Vehicles to anyone outside of BMW. BMW has never taken any
action to inform consumers about the true nature of the Defect
in Class Vehicles. And when consumers brought their Class
Vehicles to BMW complaining of the foul moldy odors, BMW
denied any knowledge of or responsibility for the Defect, and
in many instances, actually blamed owners/lessees for causing
the odor/problem.

d)     ***Where***: BMW concealed material information regarding the
true nature of the Defect in every communication it had with
Plaintiff and Class Members and made contrary representations
about the world-class quality, sophistication, state-of-the-art
safety and comfort of the Class Vehicles. Plaintiff is aware of
no document, communication, or other place or thing, in which
BMW disclosed the truth about the Defect in the Class Vehicles
to anyone outside of BMW. Such information is not adequately
disclosed in any sales documents, displays, advertisements,
warranties, owner's manual, or on BMW's website.

e)     ***How***: BMW concealed the Defect from Plaintiff and Class

Members and made representations about the world-class quality, sophistication, state-of-the-art safety and comfort of the Class Vehicles. BMW actively concealed the truth about the existence and nature of the Defect from Plaintiff and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer and BMW promised in its marketing materials that Class Vehicles have qualities that they do not have.

f)     ***Why***: BMW actively concealed material information about the Defect in Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the world-class quality, sophistication, state-of-the-art safety and comfort of the Class Vehicles. Had BMW disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff (and reasonable consumers) would have been aware of it, and would not have bought Class Vehicles or would have paid less for them.

## THE LIMITED REMEDIES' FAILURE OF THEIR ESSENTIAL PURPOSE

95.     Given the inherently defective nature of the Vehicles and their propensity to malfunction (or continue to malfunction) and require repair, and given BMW's total inability to repair the Defect and its non-disclosure and affirmative concealment of these facts, enforcement of the unilaterally imposed durational and damage limits of the express warranty would so oppress and surprise the Plaintiff and Class Members as to render these durational and damage limits unconscionable and hence unenforceable.

96.     Under the applicable warranty, Plaintiff and Class Members are entitled to the repair and replacement of defective parts. However, because the Defect persists after any repairs and replacements authorized by Defendant are made, and because Defendant knew that these actions were insufficient to cure the Defect, Plaintiff and Class Members are left without any remedy under a warranty to correct the Defect. Indeed, Defendant has had numerous opportunities to correct the Defect but has failed to do so.

97.     When Class Members present their Vehicles for a Defect-related repair, BMW is unable to remedy the Defect.

98.     Indeed, a representative of Plaintiff's BMW dealership in Pembroke Pines acknowledged that the Defect is a known issue and confirmed that there is no remedy available for the issue.

99.     Continued presentment of Vehicles by Plaintiff and Class Members to BMW in hopes of a repair or remedy would thus be futile. Simply put, Defendant's express warranty fails its essential purpose, so that Class Members are without the benefit of their primary bargain—reliable and operational Vehicles that are safe and free of material defects.

100.    The warranty service provided at BMW's, BMW's dealership's, and BMW's other agents' facilities failed to fix the problems with the Vehicles. As a result of Defendant's failure to properly or adequately repair the Defect, Plaintiff suffered direct, and reasonably foreseeable, incidental damages and did not have the benefit of a safe and reliable Vehicle.

## TOLLING OF STATUTES OF LIMITATIONS

101.    Defendant had exclusive knowledge of the defective nature of the Vehicles and knew the Defect would not be discovered by Plaintiff and Class Members unless and until the Defect. Only Defendant had access to information about the Defect, through its dealerships, pre-release testing, customer complaints, and other sources of information. Additionally, the mold accumulates in or around the evaporator, an internal area of the HVAC System not easily accessible without removal of various pieces of the Vehicle, and thus it is not intended to be an area accessible to general consumers.

102. Since the Defect cannot be detected until it manifests itself, Plaintiff and Class Members exercising due diligence were not reasonably able to discover the Defect until after purchasing the Vehicles. Plaintiff and Class Members could not reasonably have been expected to learn of or discover Defendant's omissions of material information concerning the Vehicles until after manifestation of the Defect and only then because they would be forced to research what had happened to their Vehicles. Therefore, the discovery rule applies to all claims asserted by Plaintiff and Class Members.

103. Defendant has known about the Defect since at least 2004, if not earlier, and has failed to alert Class Members to the Defect. To the contrary, upon information and belief, Defendant told Class Members their Vehicles' HVAC System's development of mold and emission of foul, noxious odors, was attributable to causes other than a defect.

104. Thus, any applicable statute of limitations has been tolled by Defendant's actions and Defendant is estopped from pleading the statute of limitations because it failed to disclose facts it was obligated to disclose concerning the Defect.

## CLASS ACTION ALLEGATIONS

105. Plaintiff seeks relief in his individual capacity and seek to represent a class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P.

23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification the following class:

### Nationwide Class

All owners and lessees of Class Vehicles purchased or leased in the United States and its territories.

106. In addition, Plaintiff seeks to certify the following state class:

### Florida Class

All owners and lessees of Class Vehicles purchased or leased in the state of Florida.

107. The Nationwide Class and the state classes above are collectively referred to herein as the "Class," and their members as "Class Members."

108. Plaintiff reserves the right to amend or modify these Class definitions after he has had an opportunity to conduct discovery.

109. <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class Members has not been determined at this time, Plaintiff is informed and believes that many thousands of consumers have purchased the Vehicles.

110. <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include for the Class, without limitation:

     a.     Whether the HVAC System is defective;

b. Whether Defendant knew or should have known of the Defect before it sold or leased the Vehicles to Class Members;

c. Whether Defendant failed to disclose the Defect to Class Members;

d. Whether the facts not disclosed by Defendant regarding the Defect were material;

e. Whether the Defect places the safety of the Vehicles' drivers and passengers at risk;

f. Whether Defendant breached express and/or implied warranties to Plaintiff and Class Members;

g. Whether Defendant violated state consumer protection statutes by its conduct;

h. Whether Defendant should be financially responsible for notifying Plaintiff and Class Members of the Defect and for the costs of repairing it; and

i. Whether Defendant should be required to reimburse Plaintiff and Class Members who paid to repair or replace the Vehicles as a result of the Defect.

111. <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of Class Members. Plaintiff and all Class Members were exposed to uniform

practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

112. <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's Counsel are competent and experienced in litigating class actions.

113. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Breach of Express Warranty
### (On Behalf of Plaintiff and the Nationwide Class or, in the Alternative, the Florida Class)

114. Plaintiff re-alleges and incorporates herein all foregoing factual allegations.

115. Defendant represented that the Vehicles were safe and reliable, among other representations and warranties alleged herein. Defendant further represented that BMW would ensure proper performance of the Vehicles. Such representations formed the basis of the bargain in Plaintiff's and Class Members' decisions to purchase the Vehicles.

116. Defendant provides an express warranty against any defects in materials and workmanship in the Vehicles to the first retail purchaser and each subsequent purchaser for 48 months or 50,000 miles, whichever occurs first. Defendant also represented that defects in materials and workmanship in the Vehicles that occurred during the initial warranty period would be replaced or repaired at no cost to the consumer. However, the time and mileage limits contained in the written warranty were unconscionable and grossly inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining those time limitations; the terms of the warranty unreasonably favored Defendant over Plaintiff and Class Members; a gross disparity in bargaining power existed as between Defendant and Class Members; and Defendant knew or should have known that the Vehicles were defective at the time of sale and would fail well before the end of their expected useful lives, thereby rendering the time limitations insufficient, inadequate, and unconscionable.

117. Defendant knew or should have known at the time of sale that the Vehicles were defective and would fail prematurely solely as a result of a defect in design, materials, and workmanship, namely, the Defect. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Vehicles. For this reason, the terms of the limited warranty

unreasonably favored Defendant over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of the warranty's time limitation, to the extent they are found to apply so as to exclude instances where the Defect manifested itself outside of that limitation, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

118. Defendant breached its express warranty by knowingly selling to Plaintiff and Class Members the defective Vehicles without informing consumers of the Defect.

119. Defendant further breached its express warranty by failing to remedy the Defect and repair damage caused by the Defect without charge to the consumer even though the Defect was present during the express warranty period, regardless of when the defect ultimately manifested. Before Plaintiff and Class Members suffered mold growth in their HVAC System and resulting damage, and while their Vehicles still were under warranty, they repeatedly brought the Vehicles to Defendant's dealerships and authorized repair technicians but were never advised to have the HVAC System examined, whether for a charge or not, despite Defendant having issued the TSB in 2004 and having identified the necessity of period cleaning of the HVAC System to address the defect in subsequent model years.

120.   As a direct and proximate result of Defendant's actions, Plaintiff and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of the Vehicles, substantial losses in value and resale value of the Vehicles, and other damages.

**COUNT II**
**Breach of Implied Warranty**
**(On Behalf of Plaintiff and the Nationwide Class or,**
**in the Alternative, on Behalf of the Florida Class)**

121.   Plaintiff re-alleges and incorporates herein all foregoing factual allegations.

122.   Plaintiff and Class Members purchased and/or leased the Vehicles from Defendant by and through Defendant's authorized agents, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from third parties.

123.   At all relevant times, Defendant was the manufacturer, distributor, warrantor, seller, and/or lessor of the Vehicles. Defendant knew or had reason to know of the specific use for which the Vehicles were purchased and/or leased.

124.   At the time of purchase or lease, Defendant provided an implied warranty to Plaintiff and Class Members that the Vehicles and their components including, but not limited to, the HVAC System, were merchantable and fit for the ordinary purposes for which they were sold. Alternatively, Defendant's descriptions of the Vehicles became part of the bases of the bargains between consumers and

Defendant, creating implied warranties that the product purchased by Plaintiff and Class Members would conform to Defendant's representations.

125. The Vehicles purchased by Plaintiff and Class Members did not conform to Defendant's representations.

126. At the time of purchase or lease, the Vehicles were defective, unsafe, and not fit for the ordinary purpose of providing reasonably reliable and safe transportation for a reasonably expected length of time. Under normal circumstances, a properly manufactured HVAC system should properly drain and/or not present a welcoming environment for the mold growth without the need for regular disassembly and treatment. Defendant cannot disclaim this implied warranty as it knowingly sold and/or leased a defective product.

127. Defendant knew or should have known the Defect existed in the Vehicles at the time of manufacture and that the Vehicles and/or the HVAC System would shortly develop a musty, vinegar odor from mold growth. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing or leasing the Vehicles. Defendant sold and/or leased to Plaintiff and Class Members the defective Vehicles without alerting them to the Defect. After sale or lease, Defendant has failed to notify Plaintiff and Class Members of the Defect.

128. Defendant knew or should have known that a reasonable consumer exercising due diligence, including Plaintiff and Class Members, could not have

discovered the Defect unless and until the defect manifested itself, as the HVAC System is an internal part and not consumer-serviceable.

129. Defendant failed to remedy the Defect and repair damage caused by the Defect without charge to the consumer.

130. Privity of contract is not required for consumer implied warranty claims under the relevant laws. However, Plaintiff and the other Class Members had sufficient direct dealings with Defendant and their agents (dealers) to establish privity of contract. Defendant, on the one hand, and Plaintiff and the other Class Members, on the other hand, are in privity because of BMW's express warranties, which Defendant extends to Plaintiff and the other Class Members.

131. Privity is also not required in this case because Plaintiff and the other Class Members are intended third-party beneficiaries of contracts between Defendant and its authorized dealerships (i.e., its agents); specifically, Plaintiff and Class Members are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiff and the other Class Members. Privity is also not required because Plaintiff's and the other Class Members' Vehicles are inherently dangerous due to the aforementioned Defect and nonconformities, namely that the HVAC System Defect jeopardizes respiratory health and health in general.

132.   As a direct and proximate result of Defendant's actions, Plaintiff and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of the Vehicles, substantial losses in value and resale value of the Vehicles, and other damages.

## COUNT III
### Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA") (On Behalf of Plaintiff and the Nationwide Class)

133.   Plaintiff re-alleges and incorporates herein all foregoing factual allegations.

134.   The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

135.   Plaintiff and Class Members are consumers who purchased and/or leased the Vehicles for personal, family, or household use.

136.   At all relevant times, Defendant conducted trade and commerce in New Jersey and throughout the United States within the meaning of the NJCFA.

137.   Defendant violated the NJCFA by engaging in the following deceptive trade practices:

a)   affirmatively representing that the Vehicles are safe, and reliable and that BMW would ensure proper performance of the Vehicles, despite knowledge of the Defect;

b)   affirmatively representing that the Vehicles were warranted against defects in materials and workmanship but did not intend to honor the warranty if, like the Defect here, it was present during the warranty period but did not manifest until after that period; and

c)   omitting and concealing the Defect, which was known to Defendant prior to sale, as alleged herein.

138.   Plaintiff and Class Members reasonably expected that the Vehicles would not be defective such that the HVAC System would fail during normal use and cause the HVAC System to emit a foul, noxious odor. Further, Plaintiff and Class Members reasonably expected Defendant to honor its warranty obligations as represented to them at the time they purchased their Vehicles.

139.   Defendant knew, or, in the exercise of diligence, should have known, that the Vehicles contain a defect, posed a safety risk, and were not suitable for their intended and/or expected use.

140.   In failing to disclose the Defect, the safety risk it posed, and the associated repair options and attendant costs which Defendant would not cover

under warranty in the event of failure, Defendant omitted material facts it was under a duty to disclose to Plaintiff and Class Members.

141. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

142. Had Plaintiff and Class Members known about the Defect at the time of purchase, including the safety hazard posed by the Defect and the monetary cost of repair, or the true effect of Defendant's warranty of the Vehicles, they would not have bought the Vehicles or would have paid much less for them.

143. Had Plaintiff and Class Members been adequately notified by Defendant about the Defect, they would not have purchased or leased the Vehicles or paid as much for them.

144. As a direct and proximate result of Defendant's actions, Plaintiff and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of the Vehicles, substantial losses in value and resale value of the Vehicles, and other damages.

145. Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

## COUNT IV
### Fraudulent Omission
### (On Behalf of Plaintiff and the Nationwide Class or,
### in the Alternative, on Behalf of the Florida Class)

146.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.    Defendant knew the Class Vehicles' HVAC System was defective, would be subject to the growth of harmful molds and mildews, and was not suitable for their intended use, and made the Vehicles' unsafe or unhealthy to drive.

148.    Defendant concealed from and failed to disclose to Plaintiff and Class members the defective nature of Vehicles' HVAC System.

149.    Defendant was under a duty to Plaintiff and Class members to disclose the defective nature of Vehicles' HVAC System because:

a)    Defendant was in a superior position to know the true state of facts about the safety defect contained in Vehicles' HVAC System;

b)    Defendant made partial disclosures about the quality of Vehicles without revealing the defective nature of the HVAC System; and

c)    Defendant actively concealed the defective nature of the Vehicles' HVAC System from Plaintiff and other Class members.

150.    The facts concealed or not disclosed by Defendant to Plaintiff and the other Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Vehicles

or pay a lesser price for them. Had Plaintiff and Class members known about the defective nature of the Vehicles' HVAC System, they would not have purchased or leased Class Vehicles, or would have paid less for them.

151. Defendant concealed or failed to disclose the true nature of the Defect contained in the Class Vehicles' HVAC System in order to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of the defective Vehicles.

152. Defendant continued to conceal the defective nature of the Class Vehicles' HVAC Systems even after Class members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today. As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A.      Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

B.      Declaring that Defendant is financially responsible for notifying all Class Members of the Defect and Defendant's obligation to repair the Defect, reimbursing Class Members for such repairs, and/or compensating Class Members for the diminution in value of the Vehicles;

C.      Enjoining Defendant, where applicable, from refusing to repair the Defect at no charge to Class Members;

D.      Ordering Defendant to pay compensatory, exemplary, and/or statutory damages to Plaintiff and Class Members in an amount to be proven at trial;

E.      Ordering Defendant to pay restitution to Plaintiff and Class Members;

F.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and Class Members;

G.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law; and

H.      Ordering such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated:  December 10, 2021                    Respectfully submitted,

                                        */s/ Andrew W. Ferich*_____
                                        Andrew W. Ferich (NJ Bar No. 015052012)
                                        *aferich@ahdootwolfson.com*

**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Tel: (310) 474-9111
Fax: (310) 474-8585

Robert R. Ahdoot (*pro hac vice* to be filed)
*rahdoot@ahdootwolfson.com*
Christopher E. Stiner (*pro hac vice* to be filed)
*cstiner@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
Fax: (310) 474-8585

*Counsel for Plaintiff and the*
*Putative Classes*

# CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated. I further certify that I know of no party, other than putative class members, who should be joined in the action at this time.

Dated: December 10, 2021          */s/ Andrew W. Ferich*
                                   Andrew W. Ferich